## Richmond

STEPHEN C. LEISGE

v.

MARILYN K. LEISGE

October 15, 1982.

Records Nos. 810705
and 820572

*Dana J. Carlson (Duvall, Blackburn, Hale & Downey,* on brief), for appellant. (Record No. 820572)

No brief or argument for appellee. (Record No. 820572)

*B. VanDenburg Hall (Philip A. Wells,* on brief), for appellant. (Record No. 810705)

*Andrew Yankwitt [N.Y.]* for appellee. (Record No. 810705)

THOMPSON, J., delivered the opinion of the Court.

In this multi-state child custody battle, the losing parent, Stephen C. Leisge, was held in contempt of court. He challenged his contempt conviction, alleging (1) that the custody order of October 3, 1980, was void and that he could not be in contempt for violating a void court order; (2) that he could not be guilty of contempt on December 30, 1981, since he did not possess the *mens rea* or the specific intent to violate the court order; and (3) that the reimbursement to the mother as directed by the court was

not based upon evidence establishing that the expenses incurred were attributable to his conduct or that they were reasonable. We reject these contentions and affirm the judgment of the trial court.

In *Leisge* v. *Leisge,* 223 Va. 688, 292 S.E.2d 352 (1982), (hereafter *Leisge I*), we resolved the dispute between Stephen C. Leisge, a Lieutenant Colonel in the Air Force, and Marilyn K. Leisge, his ex-wife, over the custody of their four-year-old daughter, Kimberly. By decree dated October 3, 1980, the trial court had ordered that the custody and control of Kimberly be awarded to Marilyn, subject to Stephen's right of visitation 12 weeks per year. Thereafter, Stephen was transferred to New Mexico by the Air Force. On December 22, 1980, he brought Kimberly to New Mexico for a visit with the understanding that he would return her to Marilyn on February 2, 1981.

During this visitation, Stephen became disturbed by Kimberly's "unusual behavior" and consulted a New Mexico attorney who recommended a psychological examination of Kimberly. The examination results showed abnormal behavior immediately threatening Kimberly's psychological well-being. On the basis of that report, on January 27, 1981, Stephen's New Mexico counsel filed in the District Court of Otero County, New Mexico, a petition for temporary custody based on changed circumstances.

On January 29, the Virginia trial court granted Marilyn's motion for a temporary restraining order barring Stephen's further action in New Mexico and directing Kimberly's return on schedule. On January 30, the New Mexico court, aware of Virginia's order, granted Stephen temporary custody. On February 12, the Virginia trial court held Stephen in contempt, fined him $500 per day, and directed imprisonment until he purged himself of the contempt. The decision was memorialized by order dated February 20, 1981.

Stephen did not return Kimberly. He later testified that his overriding concern had been her welfare, not the evasion of the Virginia court order, and that during April and May, 1981, Kimberly's behavior had improved noticeably.

On March 19, 1981, the New Mexico district court entered a temporary restraining order enjoining Marilyn from attempting to obtain physical custody of Kimberly by any means other than its process. On July 16, 1981, the New Mexico Supreme Court granted Marilyn a writ which temporarily prohibited the New

Mexico district court from holding a hearing on Stephen's custody petition.[1]

In August, 1981, Marilyn learned that Stephen had received duty orders transferring him to Germany and that he intended to take Kimberly with him. Marilyn then instituted a habeas corpus proceeding in a state court in El Paso, Texas. On August 17, 1981, an El Paso County sheriff executed a writ of attachment on Stephen at an El Paso airport, took Kimberly from Stephen's custody, and returned her to Marilyn. After a hearing three days later, the Texas court gave full faith and credit to the Virginia decree of October 3, 1980, and awarded custody to Marilyn.

On September 4, 1981, Stephen appeared in the Virginia trial court to answer its contempt citation. By order of December 30, 1981, the lower court remitted the fine imposed by the previous order of February 20, 1981, but adhered to the prior finding of contempt. It also ordered Stephen to serve 90 days in the Arlington County jail, but suspended execution of that sentence during Stephen's good behavior and obedience to all orders of the court pertaining to his cause. The trial court further directed Stephen to pay to Marilyn $25,000 as partial reimbursement of attorneys' fees and other costs incurred in effecting Kimberly's return to Marilyn's custody and control.

## I. *Was the Custody Order Void?*

■ Stephen argues that the custody order of October 3, 1980, was void since the trial court did not accord him a *de novo* trial on his appeal from the Juvenile and Domestic Relations District Court's initial award of custody to Marilyn and did not permit him to call various witnesses on his behalf. He points to *Robertson v. Commonwealth,* 181 Va. 520, 536, 25 S.E.2d 352, 358 (1943), where we said:

> It is, of course, well settled that disobedience of, or resistance to a void order, judgment, or decree is not contempt . . . . This is so because a void order, judgment, or decree is a nullity and may be attacked collaterally. [Citations omitted.]

---

[1] The temporary writ was made permanent by order of the same court on August 19, 1981. The Uniform Child Custody Jurisdiction Act became effective in New Mexico July 1, 1981. N. M. Stat. Ann. §§ 40-10-1 to 40-10-24 (1978 & Supp. 1982). 1981 N. M. Laws, c. 119 § 26.

This issue, however, was foreclosed in *Leisge I* where we affirmed the trial court and declared the custody order of October 3, 1980, to be valid.[2] 223 Va. at 694, 292 S.E.2d at 355.

## II. *Stephen's Intent.*

At the hearing in December, 1981, Stephen emphasized that his concern for Kimberly overrode all other considerations. He stated that he had followed the advice of the psychologist, his New Mexico counsel, and the New Mexico judge in instituting and continuing his legal actions. He also replied that he had understood the Virginia custody order was subject to modification based on change of circumstances and that he had thought he could properly change it in the New Mexico court. Finally, he alleged he had intended to comply with the Virginia order until he realized the severity of Kimberly's condition.

Initially, we must decide whether Stephen's contempt is civil or criminal. In *Steelworkers v. Newport News Shipbldg.,* 220 Va. 547, 260 S.E.2d 222 (1979), we reversed and dismissed a civil contempt proceeding because the trial court, in a civil setting, had imposed a criminal sanction. There, we said:

> Contempt proceedings prosecuted to preserve the power and vindicate the dignity of the court are criminal and punitive; those prosecuted to preserve and enforce the rights of private parties are civil, remedial, and coercive . . . . The character and purpose of the punishment may determine the class of contempt, as stated in the landmark case of *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418 (1911) . . . . [Citations omitted.]

220 Va. at 549-50, 260 S.E.2d at 224. In *Steelworkers,* we quoted from *Gompers,* 221 U.S. at 441-442:

> It is not the fact of punishment but rather its character and purpose that often serve to distinguish between the two classes of cases. If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the

---

[2] As we held in *Robertson,* if the order had been erroneous and correctable by the appellate process, a litigant could not disobey the order with impunity in the interval between the trial and review by the appellate court. 181 Va. at 537, 25 S.E.2d at 359.

authority of the court. It is true that punishment by imprisonment may be remedial, as well as punitive, and *many civil contempt proceedings have resulted not only in the imposition of a fine, payable to the complainant, but also in committing the defendant to prison.* [Emphasis added.]

Stephen argues that he cannot be guilty of criminal contempt since the trial court did not find that he intended to affront the dignity of the court, and since his only motivation had been a desire to best serve the physical and mental needs of his young daughter. It is also his contention that since the requisite *mens rea* had not been established by proof, his disclaimer should release him from a contempt conviction. We disagree.

In *Deeds* v. *Gilmer,* 162 Va. 157, 262, 174 S.E. 37, 78-79 (1934), we said:

A proceeding for civil contempt partakes more of the nature of a remedial civil proceeding than . . . a criminal proceeding. Its main purpose is to procure the imposition of a punishment which will afford remedial relief to the parties injured by the violation of the injunction. Not only is the proceeding instituted at the instance of the injured parties, but they are parties to it; and it is properly instituted and tried as a part of the injunction suit. *In contempt proceedings of this nature the punishment . . . imposed is not limited to a fine and/or imprisonment . . . . In appropriate cases the violator may be punished by . . . an award of damages against him in favor of the injured party sufficient to indemnify him for the pecuniary loss occasioned to him as a result of the act or omission which violated the injunction having injured or damaged property or rights which he was entitled to have protected or preserved by the injunction.* [Emphasis supplied.]

The order of February 20, 1981, shows that Stephen was being fined "civilly" until Kimberly was returned to her mother. Thus, he had the option at any time to abate his contemptuous acts by complying with the decree and returning Kimberly. The sanctity and enforceability of a civil judgment should not hinge upon the mental state of an unsuccessful litigant. In *McComb* v. *Jacksonville Paper Co.,* 336 U.S. 187, 191 (1949), the Supreme Court said:

The absence of wilfulness does not relieve from civil contempt. Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance . . . . Since the purpose is remedial, it matters not with what intent the defendant did the prohibited act. The decree was not fashioned so as to grant or withhold its benefits dependent on the state of mind of respondents . . . . An act does not cease to be a violation of a law and of a decree merely because it may have been done innocently. The force and vitality of judicial decrees derive from more robust sanctions. [Citations omitted.]

We hold that the contempt conviction of December 30, 1981, was for civil contempt and that the absence of a specific intent to violate the court order does not relieve Stephen of the consequences.

### III.   *Restitution for Expenses Incurred.*

■ Stephen assigns error to the action of the trial court requiring him to reimburse Marilyn $25,000 for expenses incurred by her in efforts to enforce the custody decree of October 3, 1980. These items included at least six separate and distinct bills submitted by that many attorneys for legal services plus court costs, telephone bills, private investigators, and travel expenses to and from New Mexico and El Paso, Texas. The figure also included over 155 hours of time Marilyn lost from her employment. Our rough estimate from the record indicated a figure of almost $37,000. Marilyn's trial counsel estimates these costs to be approximately $33,900, and the court mentioned a figure of approximately $33,000.

At the hearing Marilyn introduced as exhibits the actual bills received by her, verified in many instances by receipts or cancelled checks. The only testimonial attack on the bills came from Sandra Grisham, Stephen's counsel in New Mexico, who appeared for him in the Virginia court as a witness. She testified that her bill for services to Stephen was $7,900, and that she was "astonished" at her New Mexico counterpart's bill which was approximately twice that amount.

The trial court was attempting to fashion a remedy to comport with the exigencies of the case before it. There was no challenge

to its authority to do so. We think there was sufficient "supporting evidence" in the case at bar to supply what was missing in *Greene v. Greene,* 223 Va. 210, 288 S.E.2d 447 (1982), and *Robertson v. Robertson,* 215 Va. 425, 211 S.E.2d 41 (1975). We hold that the trial court did not abuse its discretion and affirm its conclusion.

*Affirmed.*